**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

UNITED STATES OF AMERICA

               Plaintiff,

vs.

LEONARD ANDREW LAWSON,
LIZA YOUNG VALCARCEL,

             Defendants.

3:10-cr-116-TMB -JDR

**<u>RECOMMENDATION
REGARDING
MOTIONS TO SUPPRESS</u>**

(Docket Nos. 32 & 37)

Defendant **Leonard Lawson** moves to suppress all evidence secured as a result of police searches of his residence and evidence derived from his statements to the police while he was interrogated. Docket 32. The motion also requests a <u>Franks</u> hearing.[1] Co-defendant **Liza Young Valcarcel** also known as

---

[1] <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

Liza Young filed a separate motion to suppress evidence in statements seized on July 14, 2010.  Docket 37.  The government filed a consolidated opposition to the motions to suppress and requests for a <u>Franks</u> hearing at Docket 65.  An evidentiary hearing on the motions to suppress was conducted on January 19, 20, 24 and February 14, 2011.  No separate <u>Franks</u> hearing was conducted.  For reasons stated below the magistrate judge finds that the officers exceeded the scope of the lawful protective search and took photographs inside the residence preceding the search warrant, and recommends that the motions to suppress be granted in part and denied in part.

## Findings of Fact

On July 14, 2010, Michael Christenson, Senior Security Specialists, for FedEx in Anchorage, Alaska, was alerted by an individual working at Relo 3 that they had received a suspicious package.  Mr. Christenson went to the location and viewed the box.  He noted a number of things different from the usual shipment.

He looked at the shipping label and saw that it was shipped from a Kinko's priority overnight for a lot of cash, and the box came out of Oakland, California, a source city for narcotics sent to Alaska.  The sending address for the package was 935 21st Street, Oakland, California.  The delivery address was 7100 Stella Place No. 2.  The airway bill contained a number (8714 4934 0866) that could be used for tracking the shipment.   The parcel had excessive tape and every fold

in the box was sealed.  He put the box through an x-ray machine and observed that it contained two rectangular objects containing two bags or baggies.  Based on his experience as a former police officer and past dealings with boxes shipped through FedEx he suspected the box contained narcotics.

Consistent with company policy and the contract with the shipper giving FedEx the right to open a box at any time while it is in their possession he photographed the box as he opened it.  Inside he discovered two rectangular ceramic items with two wicks protruding.  It seemed strange to him for someone to have paid about $106 to ship candles priority to Alaska.

Mr. Christenson decided to open the ceramic object and while doing so a side broke off rendering visible two white bags containing white powder.  At about 8:20 AM he called the Drug Enforcement Agency (DEA) to come over and assist. He contacted Jeffrey Gregg a member of the Drug Enforcement Task Force at the Anchorage Airport.

Nathaniel Clementson, a Special Agent for DEA was contacted by Officer Gregg and the officers met to formulate a plan for a controlled delivery of the package.  The officers utilized a field testing kit on the suspected cocaine for which it tested positive.

Gregg applied for and obtained search warrant 3AN-S10-1173 SW authorizing the opening of the black ceramic container.  This warrant was issued

about 12:54 PM on July 14, 2010.  The officers obtained contingency warrant 3AN-S10-1172 SW allowing the officers to enter a premise and retrieve the package.  The contingency warrant authorized the officers to go in and retrieve the package and nothing else.  The contingency warrant sets forth circumstances that must happen in order for the officers to enter the premises and retrieve their box.

The box was repackaged with sham controlled substances and a small amount of contraband.  It was then wired with an electronic  device that would alert the officers when the package was opened.  The package was equipped with an electronic monitoring device that emits a tone indicating the parcel remains unopened and emits a separate tone once the box is opened.

On July 14, 2010 SA Clementson portrayed a FedEx driver.  About ten people were involved in the execution delivery.  SA Clementson drove over to Stella Place after receiving word that the surveillance team members were in place.   He parked down the street and proceeded to the residence.  He had with him his cell phone with an open line to members on the surveillance team who could hear sounds from or near Clementson over the cell phone.  The cell phone was on mute so the transmissions to Clementson would not come over the cell phone.  Clementson did not have the capability of communicating with other members of the team except by speaking into the microphone.  Surveillance team members had radios to communicate with one another.

The signal emitted by the package indicated where the package was located within a short proximity to it and by a change in beeps whether the package had been opened. About 3:16 PM the officers realized that the mechanism indicating the opening of the package had malfunctioned while in the possession of SA Clementson. While SA Clementson proceeded to the residence to deliver the package, the trip wire in the package malfunctioned when the circuit was broken falsely indicating that the box had been opened. Members of the surveillance team realized this had happened but decided they were unable to abort the delivery without risking that someone would discover the undercover operation and/or endanger SA Clementson. They were cognizant that FedEx had a policy of delivering the package on Saturday because the extra mailing cost had been paid.

SA Clementson knocked on the door and heard some voices. After about 30 seconds an adult male and a child approached him from around the side of the residence. No one actually answered the door. The individual greeted the undercover agent and told him that he been expecting a parcel.

The male retrieved a cell phone and placed a telephone call while asking the FedEx agent if there was anything he had to sign. The male communicated to someone over the cell phone that the parcel had arrived. The signature given by the recipient was illegible. After viewing the illegible signature SA Clementson asked the male what name he had signed. The response was

"Anderson."  SA Clementson then left the residence and changed out of the FedEx uniform so that he could join in the surveillance.

Once the package was initially delivered the officers determined they would wait about 15 minutes before retrieving it.[2]  Within that time frame a vehicle which had been seen by surveillance earlier in the day at the Stella residence was observed coming back to the residence, pulling in and parking in the driveway.  It was a white Cadillac Escalade registered to Ms. Valcarcel.  Officer Gregg had seen her in that vehicle earlier that day.

DEA Special Agent Rikk Rambo watched the female get out of the Cadillac Escalade and walk into the house.  The individual was later recognized by him to be Liza Valcarcel.    Nothing in their investigation indicated that Varcarcel lived at the Stella Place residence.  She was observed getting out of the vehicle going into the garage and within two or three minutes coming out of the residence and getting into her vehicle carrying the FedEx parcel.  The vehicle then departed. The monitoring tone remained with the vehicle as it disappeared from the residence. Surveillance followed Valcarcel to 1831 Early View Drive.

---

[2] Richard Youngblood, an agent with DEA, and supervisor for the Airport Interdiction Task Force, deduced from the phone conversation by the recipient of the package indicating that the package had arrived as a indicator that somebody else might be coming to pick up the package.  He decided to wait about 15 minutes before authorizing a police entry into the Stella Place residence. The package left Stella Place without the officers entering the residence there.

After the Cadillac left the Early View residence several officers followed the vehicle and realized that their receivers were no longer picking up a good signal from that vehicle.  However, surveillance units at the residence were still picking up a strong signal.  The officers concluded that the package was still at the Early View residence.

Valcarcel's vehicle left Early View Drive and stopped at a red light on or near Muldoon Road.  An Anchorage Police Officer initiated a "felony stop" on the vehicle and directed Valcarcel to step out of the vehicle.  Gregg considered her to be under arrest when she was stopped and escorted out of the vehicle.  Tr 1-165. She was arrested for attempting to possess drugs.  She was placed in handcuffs and into an APD vehicle.  Officers pulled Valcarcel's vehicle into a church parking lot nearby.

Officer Gregg got out and made contact with her.  Gregg knew that the officers were preparing to enter the Early View Drive to retrieve the package and he asked Valcarcel who was in that house.  Valcarcel told Gregg that there were two elderly ladies there.  At that point Gregg advised Valcarcel of her Miranda rights using a DEA-13 Rights Advisement Card.  She acknowledged understanding her rights and agreed to talk to the officers.  Gregg explained to her that they knew what was in the box and told her that these matters were time sensitive.  When he asked

her what was going on with the box she replied: "You guys know what's in the box, It is all mine. Do what you got to do." Tr 1-163.

Gregg made arrangements to have Valcarcel transported to the DEA office as well as her vehicle. Valcarcel was processed, fingerprinted, photographed and queried about biographical data. The vehicle was not impounded. No search of the vehicle occurred at the traffic stop. Docket 77, p.44. Search Warrant 3AN10-1168SW was issued about 7:50 PM for the Cadillac Escalade. The affidavit did not disclose the malfunctioning of the device in the package. The return indicates nothing seized and that a copy of the warrant was left with Valcarcel. Gregg and SA Youngblood proceeded to 1831 Early View. Valcarcel was subsequently interrogated at the DEA office. The interview began about 7:20 PM.

.        At the interview of Valcarcel the officers wore civilian clothes. Valcarcel was not in handcuffs nor physically restrained. She was not threatened or promised anything in exchange for her speaking with the officers. The conversations occurred in a normal tone. Agent Rambo introduced himself and informed her why she was being arrested and had been taken to the DEA office. Before the officers started asking her questions she was reminded that she had been advised of her Miranda rights at the scene.

At the evidentiary hearing Valcarcel testified that she had not been advised of her <u>Miranda</u> rights during the interview. On cross examination she said she did not "hear" her <u>Miranda</u> rights read to her. I accept Officer Gregg's testimony that the <u>Miranda</u> rights were read to Valcarcel She acknowledged that she understood her rights and the officers began talking about the events of the day. At one point she asked "Do I need a lawyer?" The officers gave no verbal response. She did not specifically request an attorney. Docket 76, T-9.

During her interview Valcarcel stated she communicated with her source via cell phone. Document D, Evidentiary Hearing. Officer Gregg asked Valcarcel if she could show him the phone number of the person who sent the box. She agreed. She voluntarily let Officer Gregg look through the phone screens on her cell phone. Docket 76, T.13.

Group supervisor Richard Youngblood, on scene supervisor, made the decision that the officers would enter the Early View residence and attempt to retrieve the parcel. Without the sound alarm functioning to indicate the opening of the package, the officers did not know whether the package inside the Early View residence was likely to be destroyed or hidden. The officers waited about 15 minutes and knocked on the door of the Early View residence. Receiving no response task force officer Eric Spitzes breached the door and about 3:59 PM the officers entered the residence. The officers saw four individuals standing on a back

deck.   Present on the deck was (1) Ola Lawson, mother to Leonard and Harold

Lawson, and (2) Linda Chaney, Leonard Lawson's aunt, (3)Leonard Lawson and (4)

Harold Lawson.  The deck had a sliding glass door.   Other agents had gone around

to the back of the residence and SA Clementson called for some of them to come

and assist.  The four individuals on the deck were handcuffed, submitted to pat-down

searches for weapons and asked for their identifications.

Officers conducted an initial protective sweep inside the residence.

looking for people, animals, and hazards such as an open gas fire, chemicals, meth

lab, etc., that might be a threat to the officers.   The officers also performed a

secondary sweep which was conducted for officer safety that included looking inside

closets for hidden persons, and checking a crawl space.    SA Clementson walked

into the master bedroom and noticed the package that he had delivered earlier that

day.  He could easily see the air bill.  The package had not been opened.  During his

protective sweep he stuck his head in the bathroom that adjoined two rooms and

observed Ziplock bags on a sink.

The officers wore boots and made noise while conducting their

protective sweeps.  Some of the individuals wore body armor and weapons and the

hard sole boots made noise on the wooden floors.  SA Clementson went downstairs

in the residence to a large open area that looked like a recording studio.   He

observed a desk top computer with a flat screen monitor.  The computer screen had

a screen saver.  Tr 2-48.   He testified that he saw on the flat screen what appeared to be a FedEx web page useful for tracking a FedEx package.  SA Clementson admitted that it was possible that he had moved the mouse to turn the screen on but he claims he did not do so intentionally.  In his words he "may have jarred [it] while [he] was walking by, but again I don't recall that."  Tr 1-72.  SA Clementson observed a black ceramic candle holder on a ledge behind the computer.  Tr 1-62.

After SA Clementson conducted a protective sweep of the downstairs he went to the garage and "took a brief look around there."  Tr 1-65.  He observed a FedEx box that had a Saturday delivery tape around the box.  SA Clementson relayed the information of his findings to Anchorage Police Officer Jack Carson.

Ola Lawson was escorted to a couch to sit on in the living area.  She heard people moving on the stairwell and she couldn't tell whether it was people coming into the house or going down into the lower part of it.  Her handcuffs had been removed before she used the restroom adjacent to the master bedroom.  While she was in the bathroom she heard voices coming from the bedroom.  Based on the sounds she heard she concluded that personal items were being moved about.  Her conclusion is speculation. The two females were eventually told they were free to leave the residence and allowed to take a taxi back to their hotel.

Harold Lawson had recently come to Anchorage for a visit.  He was staying at his brother's residence at 1831 Early View.  He testified that he was

familiar with the house except for the master bedroom which he did not enter. He testified that he was told about the shotgun and that it was available for bear protection.

The studio contained a cabinet full of CDs. Harold Lawson testified that while he was held inside the residence he could hear a person on or persons running up and down the stairs and shuffling throughout the house. He testified that he heard what sounded like CDs as they were hitting the floor. This is speculation. Photos taken by a drug team member show the CDs still in place until execution of the search warrant for 1831 Early View. Harold Lawson denied receiving any documents from the police relating to the execution of a search warrant. After he returned from the DEA office the next day he picked up CDs from the floor.

While the officers waited several hours for the arrival of the search warrant for that residence they did move about the home. While waiting for the search warrant the officers used the restroom, removed their body armor, and took turns maintaining surveillance on the exterior of the residence. The officers were informed of the existence of the warrant about 7:59 PM on July 14, 2010.

According to Officer Gregg's affidavit for the Early View residence search warrant the entry team entered that residence at about 3:59 PM. Exhibit C, p.5, Docket 32. The affidavit includes observations made by agents who

participated in clearing and securing the residence including the following information:

> "The FedEx parcel was removed from the master bedroom. In the garage another FedEx parcel with the same dimensions was observed; that parcel had been opened and the shipping label removed. In the downstairs recreation room a computer screen was observed displaying a web page for FedEx tracking. In the same room a black ceramic appearing identical to the controlled delivery package without the wax contents. Sandwich bags which are frequently used as packing material were observed in the master bedroom. A shotgun was observed in the corner of the master bedroom. Suitcases bearing luggage tags from California were observed in the downstairs room. The FedEx parcel which was the subject of the controlled delivery that had been sent from California. Marijuana paraphernalia such as pipes with residue and burnt marijuana cigarettes were observed in the downstairs room."

After receiving notice of the issuance of the search warrant officers took the "pre-photographs." Tr 1-182. Officers also photographed the evidence seized, and then took photographs once the search was concluded. Tr 1-177. Photographs were taken by members of the National Guard using their own photographic equipment. Tr 3-102.

Officer Carson asked other officers at the residence to tell him about observations that were made inside during the protective sweeps. Then he conveyed that information to Officer Gregg for preparation of a search warrant affidavit. Officer Gregg received this information about 30 minutes after the initial stop of Ms. Valcarcel's vehicle. Tr 1-188.

Gregg asked APD Officer Jack Carson if he would assist him in getting a search warrant for the residence at 1831 Early view Drive. Officer Carson did not have access to Gregg's original affidavit and was going to be on overtime so he declined.

Officer Gregg then prepared an affidavit for the search warrant using information provided by Officer Carson including matters that there was a box in the garage with dimensions identical to the controlled delivery parcel (Tr 1-191). Gregg was informed that the parcel that had been delivered by Clementson that day was located in the master bedroom upstairs. Gregg was told by another officer that there was baggage downstairs that had luggage tags indicating that they came from

California.  The officer considered that significant because the FedEx parcel had been shipped from California.

Officer Gregg's affidavit did not state that the beeper had malfunctioned. Gregg explained at the evidentiary hearing  that it did not occur to him to include that information.  Gregg's affidavit includes the observations of the FedEx tracking screen, the fact that the controlled delivery box was recovered inside the residence, the ceramic container that was observed in the residence, the FedEx box with similar dimensions, the fact that there were suitcases with California bag tags, the sandwich baggies observed in the master bedroom, and marijuana paraphernalia observed in the residence as well as a shotgun behind a door.  Gregg considered the fact that the box had been taken to the residence at Early View Drive significant to the issuance of a warrant; he considered the condition of the box being unopened as not significant.  Gregg's affidavit did not affirmatively represent that the package alarm had gone off prematurely.  The malfunction was a change in tone resulting from a failure to transmit the non-alert tone.  Tr 3-20.

Detective Monique Doll proceeded to the magistrate's office to obtain the search warrant but Magistrate Comfort would not issue the warrant because the affidavit contained a description of Gregg's training and experience and not Doll's. Officer Gregg then had to leave the Tudor office located between Lake Otis and the Seward Highway near the Airport and go to the magistrate's office downtown to

obtain the search warrant. Because of the sequence of events necessary in obtaining the last search warrant, I conclude that the officers timely applied for and obtained a search warrant for the 1831 residence. Detective Doll took the search warrant to the residence.

Officer Gregg testified that a copy of the warrant was provided to Harold Lawson. Tr 1-199. Harold Lawson is Leonard Lawson's brother who was staying at the residence. The search warrant return also indicates a copy was given to Harold Lawson. Exhibit C, p.12 to Docket 32-4. On cross-examination Gregg stated that he believed he gave Harold Lawson a copy of the search warrant at the DEA building. Tr 2-58. Harold Lawson denied receiving any document relating to the search warrants.

There are two interview rooms at the DEA office. Neither Valcarcel nor Lawson were free to leave when they were being questioned at the DEA headquarters. At the DEA office Lawson was advised of his rights. He indicated that he understood his rights and agreed to talk to the officers. He stated the shotgun belonged to Ms. Valcarcel, but his fingerprints might be on it. There were no threats, intimidations or promises made to Lawson. The interview with Lawson appeared very amicable and he was cooperative. Lawson did not appear to be angry. There was no swearing or shouting. The interview with Lawson lasted about and hour and

45 minutes.  Lawson admitted involvement in drug trafficking activity outside the events of the day.

Officer Gregg wrote in his report that they initiated the interview with Liza Valcarcel about 8:20 PM at the DEA office. The interview took place in a room with a table and chairs at the DEA headquarters on Tudor Road.  No weapons were brandished or threats made to her in exchange for her statements to the officers. The atmosphere was amicable and SA Rambo described Ms. Valcarcel as very sedate.

Officer Gregg reminded Valcarcel that she had been <u>Mirandized</u>. She tried to take sole responsibility for the drugs that had been seized.  No promises were made to her for her cooperation.  She was told that people who cooperate with DEA and with the government stand a better chance at any sentencing.  She never indicated she wanted an attorney present nor did she appear to be visibly upset. Essentially, she admitted her knowledge and involvement in the incident.   Her interview lasted about 45 minutes.  SA Rambo concluded that her statements about the shotgun belonging to her lacked credibility because she knew very little about the type of action or the shotgun itself.   No request was made by either of the suspects to stop the interview at any time or to see an attorney. Both suspects spoke English.

//

//

**Analysis**

I.      **Seizure of Package**

The package containing the drugs was handled by FedEx, a private mail carrier.  The package was opened by a FedEx employee consistent with FedEx policy when he suspected it contained contraband drugs. The private search doctrine of the Fourth Amendment permits a warrantless search when government officers are unaware of the private search.  <u>United States v. Oliver</u>, ___ F.3d ___ (5th 2011, WL 38035.  Upon seeing the contents, a FedEx employee contacted the Drug Enforcement Agency (DEA).

The law enforcement agents did not exceed the scope of the prior private search without a warrant when they field tested the powdery substance observed in plain view inside a baggie after receiving the package from FedEx. The U.S. Supreme court has made clear that the Fourth Amendment's protections apply to a government search conducted subsequent to a private search to the extent the government's inquiry is more intrusive or extensive than the private search.

In <u>United States v. Jacobsen</u>, 466 U.S. 109 (1984) the court held that police officers' warrantless reopening of closed containers inside a package after a private search had revealed the white powder suspected of being a controlled substance did not intrude on any expectation of privacy that was not already frustrated by the earlier private search.  <u>Jacobsen</u> also upheld the warrantless

chemical testing of the powder on the ground that a chemical test that reveals only the presence or absence of an illegal drug does not intrude on a legitimate expectation of privacy.  Jacobsen permits the warrantless temporary seizure of a Federal Express package that contained contraband.

A field test by a method which would identify cocaine and nothing else is not an illegal search because it violates no legitimate expectation of privacy (in contraband).  Jacobsen, supra.   Because the chemical test of the powder gave a positive reaction for the presence of cocaine a delay of the delivery of the FedEx parcel and its  removal from the mail stream were reasonable.  Before conducting a  more thorough search of the package the DEA agents obtained search warrant 3AN-10-1173-SW.

### Controlled Delivery

The agents controlled delivery was designed to take place within the time frame in which the package would normally have been delivered.   An addressee's possessory interest under the Fourth Amendment is in the timely delivery of a package, not in having it routed in a particular manner.  United States v. Hernandez, 313 F.3d 1206, 1210 (9th Cir. 2002).  Under United States v. Aldaz, 921 F.2d 227 (9th Cir. 1990) postal authorities may seize and detain packages if they have a reasonable and articulable suspicion of criminal activity.  Here, the agents had probable cause for suspecting legal wrong doing.

Anchorage Police Department (APD) Officer Gregg assigned to the Drug Enforcement Administration (DEA) Task Force applied for and obtained a contingency warrant authorizing the retrieval of the FedEx box and its content. The contingency search warrant number 3AN-10-1172-SW was issued by a State judicial officer at 12:57 p.m. on July 14, 2010.[3] The search warrant authorized the search of the Stella Place premises or the final resting place of the FedEx package based upon the following contingent happening of events:

> "The box is delivered and received by person at 7100 Stella Place #2, or left at the front door, and the person takes the box inside, or a person takes the box to another location and one of the following has occurred: a change of tone indicating the box has been opened, the electronic device fails to transmit or at least two hours has elapsed with no change indicating the box remains unopened inside of the residence."

The warrant also authorized the postponement of notice of the warrant within a reasonable time period.

While SA Clementsen, posing as a FedEx employee, proceeded from his vehicle to the front door of the Stella Place residence monitoring officers

---

[3] Exhibit 2 to Docket No. 32.

discovered that the triggering device implanted to alert them when the package had been opened had gone off. Surveilling officers knew that the package had not yet been opened because it was still in the hands of SA Clementsen. Although the officers could monitor Clementsen's conversation and sounds near him through his cell phone they had no practical way of communicating with Clementsen to inform him that the alerting device for the opening of the package had malfunctioned. Because SA Clementsen was just moments from the front door it was reasonable for the officers to proceed with the controlled delivery knowing that they would not be able to determine from their alerting device when the package had been opened. There is no evidence of any intent or ruse by the government to cause this alerting device to malfunction.

### Compliance With The Contingency Warrant

Defendants argue that entry of the officers into Lawson's Early View residence to retrieve the package was illegal because the contingency conditions of search warrant of 3AN-10-1172-SW had not occurred. Clearly the box was taken to a location other than the place of delivery. The contingency warrant provided that if a person takes the box to another location and the electronic device fails to transmit then pursuant to that warrant the officers may enter the premises to retrieve the FedEx box.

The affidavit to the search warrant states that the electronic monitoring device will be activated when the box is delivered and will emit a specific tone indicating that the parcel remains unopened and will emit a separate tone once the box is opened. Clementsen Affidavit, p.4 of Exhibit B to Docket 32.[4] The court determines that the malfunction contingency occurred when the electronic device designed to monitor whether the package had been opened prematurely triggered. The affidavit explains that once they have reason to believe that the package has been opened the agents will petition the court for a search warrant for the residence, vehicle or person associated with handling of the box.

### Valcarcel's Arrest

Just as officers were posed to enter the premises to retrieve the package defendant Liza Young Valcarcel arrived back at the Stella residence and went inside. This was shortly after the recipient of the package had a conversation on his cell phone advising in essence that the package had arrived. The officers could reasonably infer from these facts that Valcarcel was expecting the arrival of the package. About 3:33 PM she was observed accepting the FedEx package from the male who took delivery of it from undercover SA Clementsen. Valcarcel placed the FedEx box in her Cadillac Escalade and drove off with it. The box still emitted

_____

[4] The affidavit in Search Warrant 3AN-10-1172-SW is Plaintiff's Exhibit 2 at the Evidentiary Hearing on the Motions to Suppress.

a tone which could be picked up only within close proximity to it.  The agents determined that Valcarcel drove away with the box in the car.

Officers followed the Escalade away from the Stella residence and were able to maintain the signal while following her.  Thus, they knew that Valcarcel had the package with her and that it was no longer at the Stella location.  Shortly thereafter, Valcarcel drove her vehicle into the garage of her residence at 1831 Early View.  She remained there only a few minutes and pulled out of the garage.  She was followed by law enforcement officers.  Officers monitoring the package lost the tone near her vehicle indicating that she was no longer carrying the package.  Other officers watching the Early View residence were still receiving the tone meaning that the package remained at the 1831 Early View residence.  Supervisor Youngblood directed the police to pull Valcarcel over and arrest her.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  A temporary detention of an individual during the stop of a motor vehicle by police even for a brief period or for a limited purpose constitutes a "seizure" of "persons" within the meaning of this provision. *See* Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Brignoni-Ponce. 422 U.S. 873, 878 (1975).  The touchstone of the Fourth Amendment is reasonableness."  Florida v. Jimeno, 500 U.S. 248, 250 (1991).  Reasonableness is measured in objective terms

by examining the totality of the circumstances.  <u>Ohio v. Robinette</u>, 519 U.S. 33, 39 (1996).

The government argues that the officers had probable cause to arrest Valcarcel when SA Youngblood directed officers to effect the traffic stop.  If the officers had probable cause to arrest Valcarcel when they did then no warrant was necessary under the Fourth Amendment because of exigent circumstances.   The fact that Valcarcel was in a moving vehicle and may have had the contents of the package with her relaxes the requirement for a warrant on grounds of practicality. It does not, of course, dispense with the need for probable cause.

Probable cause justifying an arrest without a warrant exists if the facts and circumstances known to the officer warrant a prudent person in believing that an offense has been or was being committed. <u>Henry v. United States</u>, 361 U.S. 98 (1959).  The probable cause test is an objective one.  The facts must be sufficient to warrant a belief by a prudent person of reasonable caution.  <u>Henry</u> <u>supra</u>; <u>Beck v. Ohio</u>, 379 U.S. 89 (1964); <u>Dumbro v. United States</u>, 208 U.S. 435 (1925). Probable cause is to be viewed "from the vantage point of a prudent, reasonable, cautious police officer . . . guided by his experience and training."  <u>United States v. Davis</u>, 458 F.2d 819 (D.C. Cir. 1972).  See also <u>United States v. Ortiz</u>, 422 U.S. 891 (1975)(officers are entitled to draw reasonable inferences from the facts in light of their knowledge and prior experience.

Probable cause deals with probability not technicalities. Under Brinegar v. United States, 338 U.S. 160 (1949), the probable cause standard does not require the law officers to have direct, physical evidence. What is needed is evidence supporting reasonable inferences. Evidence sufficient to show probable cause for arrest may be found in circumstances which do not actually establish the crime itself. United States v. Rueda, 549 F.2d 865 (2nd Cir. 1977). "Strong reason to suspect" is not adequate to support a warrant for arrest. *Id.* at 101. On the other hand, evidence required to establish guilt is not necessary. Brinegar supra. If the arrest was lawful, a search and seizure made in connection with that arrest was likewise lawful. Draper v. United States, 358 U.S. 307, 310 (1957).

On the facts of this particular case the arrest of Valcarcel took place essentially when the officers stopped her vehicle. Prior to the stop of the vehicle the officers had reasonable cause to believe that a crime had been committed. There was certainty as to the commission of a crime because the officers knew that cocaine had been sent through the mail. The officers had seen Valcarcel carry the control package soon after its delivery at Stella Place and transport it to her own residence. The officers did not know whether the package had been opened before she left her residence.

Because the officers knew that the package contained cocaine they had reasonable cause to believe that her possession of the package under the

circumstances constituted the possession or attempt to possess illicit drugs. Valcarcel had been to the Stella Place residence for a short time earlier in the day. She returned at that residence soon after the recipient of the package indicated over a cell phone that the package had arrived. Valcarcel entered the Stella Residence only long enough to receive the package and then leave. There was evidence that the recipient of the package stated that they were looking for a package to be delivered. The parcel itself was suspicious in the way it was packaged and sent. The addressee of the parcel was not a name of any person known to be residing at that address. Driving a vehicle, visiting a residence and picking up a package and then driving away are all acts that are each outwardly innocent. However, considering the totality of the circumstances these facts support a reasonable confluence that Valcarcel was intending to possess illicit drugs.[5] For purposes of probable cause, trained officers could consider Valcarcel's prior conduct to infer guilty knowledge of the package contents.

Even if an officer arresting a suspect does not have first hand knowledge of facts to constitute probable cause, the Fourth Amendment is not violated if the officers have collective knowledge to support the stop or arrest. United States v. Williams, 627 F.3d 247 (7th Cir. 2010). Officers had conducted

---

[5] AS 12.25.030(a) authorizes law enforcement officers to arrest a person without a warrant "for [any] crime committed or attempted in the presence of the [officer]."

prolonged surveillance of the Stella Place residence and Valcarcel's vehicle. The officers were justified in following her vehicle from Early View Drive and effecting her arrest. There was probable cause to arrest her on suspicion of participating in a drug conspiracy.

.                      **Entry of Residence at 1831 Early View**

The Fourth Amendment is a personal right that must be invoked by an individual. *See* <u>Katz v. United States</u>, 389 U.S. 347, 351 (1967)("[T]he Fourth Amendment protects people, not places".) Probable cause alone for belief that certain articles subject to seizure are in a residence cannot justify a search without a warrant. *See* <u>Taylor v. United States</u>, 286 U.S. 1, 6 (1932); <u>Agnelo v. United States</u>, 269 U.S. 20, 33 (1925). Thus, the search and seizure of the residence and its occupants by police is legal under the Fourth amendment only if a search warrant was issued, or an exception to the warrant requirement such as exigent circumstances existed.

The government's position is that the warrantless entry into the residence was permitted because exigent circumstances existed, namely to prevent the destruction of evidence. The entry to retrieve the package is reasonable under the Fourth Amendment as long as the circumstances when viewed objectively justify the action. The government bears the burden of establishing the existence of exigent circumstances to overcome the presumption of unreasonableness that

attaches to all warrantless home entries.  <u>Welch v. Wisconsin</u>, 466 U.S. 740, 750 (1984).

The Supreme Court has held that exigent circumstances exist when law enforcement officers enter onto private property to prevent the imminent destruction of evidence.  <u>Ker v. California</u>, 374 U.S. 23, 40 (1963).  In assessing whether sufficient exigent circumstances exist to justify the warrantless entry the court must consider the totality of the circumstances and the inherent necessities of the situation at the time.  The exigent circumstances exception to the warrant requirement is particularly compelling in narcotic cases because narcotics can be so quickly destroyed.  <u>United States v. Young</u>, 909 F.2d 442, 446 (11th Cir. 1990).

The Ninth Circuit has approved a controlled delivery procedure.  *See* <u>United States v. Hackett</u>, 638 F.2d 1179 (9th Cir. 1980).  In order to establish a perpetrator's knowledge of the contents of the package it is necessary to apprehend a person having access to the package as quickly as possible particularly if the package has been opened.

Here, it appears that the package had reached its final destination and there was reason to believe that other persons occupied the residence after Valcarcel departed from it. It was reasonable for the officers to conclude that unknown persons at the residence could destroy or remove evidence.  The officers had no way knowing that the package would end up at this particular place when the

controlled delivery commenced. The malfunction of the beeper inside the package prevented the officers from learning whether the package had been opened.

Although Alaska State Magistrates can issue warrants by telephone, the warrantless entry was imperative. I conclude that it was reasonable for the officers to decide that a warrant could not have been obtained in time even by telephone because of the time needed to gather the facts for presentation in an affidavit or sworn testimony including the facts of the controlled delivery in surveillance of the premises and transportation of the package by officers conducting surveillance. *See* McDonald v. United States, 335 U.S. 451, 456 (1948).

The government's position is that no search of the house was conducted until the warrant was issued and that the agents only did a protective sweep of the premises. Defendants argue that any exigency was created by the agents and therefore the exigent circumstances exception does not apply. The Supreme Court has held that "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not in itself an unreasonable seizure of either the dwelling or its contents." Segura v. United States, 468 U.S. 796, 104 S. Ct. 3380, 3388 (1984). At the traffic stop Valcarcel told the officers that there were two older women in the Early View residence. an officer observed four people on the rear deck. Under the circumstances of this case the court should find that the warrantless entry and the

seizure of the occupants therein were reasonable under the Fourth Amendment based on the exigent circumstances exception.

## Securing The Premises

The Supreme Court in <u>Illinois v. McArthur</u>, <u>supra</u> set forth the relevant test for determining the reasonableness of a seizure of a residence. Under this test the court is to balance the privacy related and law enforcement related concerns using four factors, namely: (1) whether the police had probable cause to believe that the defendant's residence contained evidence of a crime of contraband; (2) whether "the police had good reason to fear that, unless restrained," someone would destroy the evidence or contraband before the police could return with a warrant; (3) whether "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy"; and (4) whether "the police imposed the restraint for a limited period of time: – in other words, whether the "time period was no longer reasonably necessary for the police, acting with diligence, to obtain the warrant." *Id*. at 331-332.

I conclude that the seizure of the residence to secure the premises was reasonable. The police acquired probable cause to believe that the package containing contraband was in the Early View residence when they saw it taken there by Valcarcel. The package still indicated its location by a beeper sound and surveilling officers observed Valcarcel leave the residence without the package. The

police had good reason to fear that someone at the Early View residence might destroy the evidence or contraband before the police could return with a warrant.

The officers made reasonable efforts to accommodate the personal privacy needs of the residence without compromising the integrity of the evidence while a search warrant was being sought. The time period for which the occupants were restrained and the premises secured was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant. The officers were diligent in their pursuit of a search warrant.

Officer Gregg attempted to have Officer Doll apply for the search so that application could be made expeditiously. When it appeared that Officer Doll lacked some of the critical information that could be furnished by Officer Gregg in a relatively short period of time Officer Gregg proceeded to the magistrate's chambers where the warrant was issued. In United States v. Holzman, 871 F.2d 1496, 1507 (9th Cir. 1989), overruled on other grounds by Horton v. California, 496 U.S. 128 (1990), the Ninth Circuit Court of Appeals concluded that a 13 hour seizure of a hotel room was reasonable. Here, the seizure was much shorter than that in Holzman.

In the instant case the officers were authorized to question those present in the residence to determine if they probably were a suspect in the investigation. The occupants were detained and segregated for officer safety and to allow for questioning the occupants individually. Separating the occupants of the

residence while they were handcuffed was done for officer safety to prevent them from gaining access to a hidden weapon. *See* generally, Chimel v. California, 395 U.S. 752, 768 (1969). The Ninth Circuit Court of Appeals has held that officers are permitted in such circumstances to take reasonable steps to ensure their safety. The officers assisted Ola Lawson and Linda Chaney by calling a cab so they could return to their hotel. Leonard Lawson and Harold Lawson were subsequently taken to the DEA office for further questioning.

**Scope of Protective Sweep**

The Supreme Court holds that the Fourth Amendment permits a properly limited protective sweep in conjunction with reason to believe based on specific and articulable facts that the residence to be swept harbors an individual posing a danger to those on the arrest scene. Maryland v. Buie, 494 U.S. 325, 327 (1990).

Defendants argue that the officers entry into the Early View residence consisted of more than conducting a protective sweep and securing the residence while the search warrant was being sought. They argue that the officers conducted a search at the residence prior to the issuance of the search warrant. I agree in part.

The scope of the protective sweep is not limited to the area in which the package is actually observed. The officers have a right to go throughout the residence to see who might be present. Illinois v. McArthur, 531 U.S. 326 (2001)

allows officers to take steps to avoid significant intrusion into the home itself while an officer obtains a search warrant.

A protective sweep is "not a license to search every nook and cranny of a house", and is subject to two significant limitations:  first, it extends only to a cursory inspection of those spaces where a person may be found. Second, it must last no longer than it takes to complete the task.

The defendants argue that the officers conducted a warrantless search of the premises while it was supposedly being secured and a search warrant was being sought.   Defendants rely in part upon the testimony of occupants who while restrained by the officers in one part of the residence heard shuffling or commotion occurring in another part of the residence.

Linda Chaney claims that while she was on the deck she heard noise coming from the upstairs bedroom and kitchen that sounded like people walking around on hardwood floors or stairs.  She concluded that the officers were searching the house.  She had never been in the master bedroom and her testimony does not distinguish between the officers searching for other occupants during the protective sweep moving objects in such a manner as to conduct a search of the premises. Except as noted below, I conclude that the shuffling noise was officers acting in haste to conduct a protective sweep or secure the premises rather than the actions of conducting a search which would likely have been done at a slower place.  I

discount her suspicion that the officers were actually conducting a search of the premises prematurely.

Harold Lawson, Leonard Lawson's brother was also visiting from California. He was staying at the Early View residence but had not been in all rooms of the residence at the time he was seized by the officers. He remained on the deck about 30 minutes before being taken by officers to the kitchen. At the residence the officers asked him no questions nor did they direct that he do anything. He testified that he heard shuffling and that he knew that there was a shot gun in the house that day. At the suppression hearing he admitted that he and Leonard had discussed the shotgun and they are both convicted felons. He claims that he was told that the shotgun was there if he needed protection.

Harold Lawson testified that he heard noise while standing on the deck. Some of the noise he heard seemed to come from the front door just after officers got on their radio to indicate that the premises had been entered. He claims he heard foot traffic and shuffling of objects like DVDs hitting the floor. Exhibit J, a photograph of 1831 Early View taken on July 14, 2010 shows racks of DVDs on the shelf. (Photo #28). Harold Lawson claimed he straightened up the DVDs after he returned home from the DEA office. He was released in the late evening on July 14, 15, 2010. I conclude from the totality of the evidence that the DVDs on the

floor that he observed were placed there during the execution of the search warrant not prior thereto.

FPD Investigator Barbara Brink offered her observations of the government's photographs produced in discovery as to what the camera or digital pictures reveal as to when they were actually taken. She stated that the program used by the government to produce images of the digital pictures reveals the type and serial number of the camera. She observed that the time for the recording of the photograph of Valcarcel retrieving the package from Stella Place (Exhibit I) in the surveillance record time coincides with the digital data. Based on that observation she concluded that the 64 photographs in Exhibit J must have been taken prior to the issuance of the search warrant. The Search Warrant for Early View Drive was issued at 7:55 PM on July 14, 2010 according to the face of the search warrant. Exhibit C, p.11, Docket 65. Brink testified that photos of the interior of the residence showed that they were taken as early as 6:44 PM.

Two members of the National Guard participated in the investigation by taking photographs. The 64 photos in Exhibit J were taken by Oliver Meza. He took "opening photographs" to document the condition of the premises before the search warrant was executed. Tr 4-13. He undertook no search nor did he see anyone else do so prior to the issuance of the warrant. To the extend that the government may seek to use the "opening photographs" as evidence they should be suppressed

as obtained preceding the warrant.  These photographs were not used to apply for the search warrant at 1831  Early View.

The officers had a lawful reason to check the garage for additional persons during their protective sweep.  Leonard Lawson was in the garage when this occurred.  Lawson's affidavit, Exhibit D attached to the motion to suppress indicates that after he was taken to the garage on July 14 he observed that officers had removed a FedEx container from a shelf.  The affidavit indicates that the container was lying open on the floor and that the officers had to search through various boxes on the shelf to locate it.  This was not stated in the testimony at the evidentiary hearing.

Lawson's affidavit claims that while he was in the garage an officer demanded to know the contents of another box in the garage and he informed him that it contained a keyboard.  Since Lawson was kept in the garage until he was removed to the DEA office he likely would have seen any officer removing a FedEx container from a shelf.  He did not assert such claim in testimony.  SA Clementson observed a FedEx box which he believed had Saturday tape on it. Tr 1-191.  I determine from the facts that this FedEx box and tape were visible without it being removed from the shelf.

The government does not explain by evidence how the computer screen could reveal the web page for FedEx tracking without the "mouse" being moved

particularly with a screen saver that placed the screen in rest mode while not in use. The computer screen in the recreation room would have been observed by the officer long after the package had been delivered. There was no longer a need for anyone to be tracking the delivery of the package. Moving the mouse was beyond the scope of a lawful protective sweep. The search of the screen exceeded a protective sweep.

The evidence is unclear as to how the "California tags" on a suitcase could have been observed without manipulation. The government bore the burden of showing that such tags were visible in plain view during the protective sweep. A protective sweep must be narrowly confined to a cursory visual inspection of those places in which a person may be hiding. I determine this observation was made beyond the scope of a lawful protective search.

It appears from the evidence that the shotgun in the master bedroom and sandwich baggie in the master bathroom were observed in plain view during a lawful protective sweep. The black ceramic container in the downstairs recreation room was located behind the computer flat screen and could not have been observed in plain view without exceeding the scope of a lawfully cursory protective sweep. The evidence does not indicate otherwise.

The defendants argue that some of the observations stated in SA Clementson's affidavit are based on the officers search of the premises before the

search warrant was issued.  I agree with respect to evidence of the FedEx web site on the computer screen, the ceramic container and the presence of California tags on luggage.  These "observations" must be suppressed.

### Leonard Lawson's Arrest

Lawson argues that the arresting officers did not have "probable cause" within the meaning of the Fourth Amendment to the Constitution to arrest him without a warrant.  A valid warrantless arrest requires probable cause to believe that the arrestee committed a crime.  United States v. Watson, 423 U.S. 411, 418 (1976).  Probable cause deals with probabilities not technical considerations.  Brinegar, supra 338 U.S. at 175.  Probable cause exists where the facts and circumstances within the arresting officers' knowledge and of which they had reasonable trustworthy information are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed.  Carroll v. United States, 358 U.S. 307, 310 (1925).

An arrest of a person cannot be based upon evidence discovered by an illegal search.  Excluding the two tainted observations made in the residence while it was being secured the officers had the following information to believe that Lawson was involved in an offense:  The package had been taken to Lawson's residence by Liza Valcarcel in a vehicle that was registered at Lawson's address.  The package had been left at Lawson's residence.   Liza Valcarcel had told the police that she

owned the drugs. Lawson admitted he had been involved in drug trafficking before. Tr 3-84. A shotgun was found in the master bedroom at Lawson's residence. Lawson admitted his fingerprints must be on the gun. Drug paraphernalia was found in the premises. There was probable cause to believe that Leonard Lawson participated in a drug conspiracy.

### Leonard Lawson's Statements

The interrogation occurred while Lawson was under lawful restraint in the DEA office interrogation room. He was lawfully detained for questioning and the fruits of the search of the residence provided sufficient corroborative evidence to support a finding of probable cause that he committed a drug offense. Leonard Lawson's statements were voluntary and not taken in violation of his Miranda rights or his Fifth Amendment right to remain silent. Lawson was not induced or coerced to relinquish his constitutional right to remain silent. I find no credible evidence that he was promised anything including a promise not to be charged if he gave up his right to remain silent.

I find no evidence that Lawson's will was overborne by psychological coercion or improper inducement. I find no evidence that Lawson's exercise of his right to remain silent was a result of any statement by the officers that he would receive harsher treatment by a court or prosecutor if he did not waive his right to remain silent. I conclude that the government has proved by a preponderance of the

evidence that Lawson's statements were voluntary.  *See* Lego v. Twomley, 404 U.S. 477, 488 - 89 (1972).

### Valcarcel's Statements

Valcarcel argues that she was subjected to questioning by the law enforcement officers in violation of her Miranda rights and that her statements were not made voluntarily. Pursuant to Miranda v. Arizona, 384 U.S. 436 (1966) and Rhode Island v. Innis, 466 U.S. 291, 300 (1980) a person must be advised of his Miranda rights whenever that person is subjected to custodial interrogation.  Under Miranda a person may invoke her right to counsel at any time after being taken into custody so long as it is in the context of an imminent custodial interrogation. Miranda, 384 U.S. at 473-474.  Invocation of the Miranda right to counsel "requires at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." Davis v. United States, 512 U.S. 452, 459 (1994); McNeil v. Wisconsin, 501 U.S. 171 (1991).  Davis articulated further that in interrogations taking place after a Miranda waiver, only "unambiguous" and "unequivocal" requests for counsel trigger the protections of Edwards.  Davis, 512 U.S. 452 (1994).  *Id.* at 452.

A waiver of Fifth Amendment rights must be the "product of a free and deliberate choice rather than intimidation, coercion, or deception" and "made with a full awareness of both the nature of the right being abandoned and the

consequences of the decision to abandon it." <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986). If the government establishes that a Miranda warning was given and that it was understood by the suspect, the suspect's uncoerced statement establishes an implied waiver. <u>Berghuis v. Thompkins</u>, 130 S.Ct. 2250 (2010).

Whether the waiver is valid depends upon the totality of circumstances including the background, experience and conduct of the defendant. <u>United States v. Doe</u>, 155 F.3d 1070, 1074 (9th Cir. 1998)(en banc). "A waiver is knowing and intelligent if, under the totality of the circumstances, it is made with a 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" <u>Doe</u>, <u>supra</u> at 1074, quoting <u>Moran v. Burbine</u>, 475 U.S. at 421. The waiver is voluntary if under the totality of the circumstances the statements were the product of a free and deliberate choice rather than coercion or improper inducement. <u>Doe,</u> supra at 1074.

Under the evidence presented Valcarcel was advised of her <u>Miranda</u> rights at the traffic stop by Officer Gregg using a DEA-13 Rights Advisement Card. She acknowledged understanding those rights and agreed to talk to the officers. Tr 1-162. A suspect may implicitly waive her rights by answering an officer's question(s) after receiving <u>Miranda</u> warnings. <u>Terrovona v. Kincheloe</u>, 912 F.2d 1176, 1179-80 (9th Cir. 1990).

The interview took place in a room at the DEA headquarters.  The room contained a table with chairs and no camera or electronic equipment or telephone.  The interview took place in the late afternoon on July 14, 2010.  Two officers were present during the interview.  No weapon was visible or brandished.

SA Rikk Rambo characterized the atmosphere as amicable.  From the outset Valcarcel tried to take sole responsibility for the drugs that had been seized.  Officer Gregg reminded her that she had been <u>Mirandized</u> before the officers began to speak with her.  Tr 3-73.  SA Rambo asked Valcarcel if she was aware of why she had been transported to that office.  Valcarcel's response was: "I've already told you that its – -- it was all mine, everything was mine."  Tr 3-72.

Valcarcel was told that historically people who cooperate with DEA and with the government tend to fair better at sentencing than people who do not cooperate.  She was advised that if she cooperated the agents could not make her any promises but it would look favorable for her.  Docket 76, p.9. She was not threatened in any way as to what might happen to her if she failed to cooperate. The interview lasted about 45 minutes. Valcarcel never became upset nor did she ask that the interview be terminated.

Neither Valcarcel nor Leonard Lawson were free to leave while they were being questioned at DEA headquarters.  There was no shouting or swearing or use of abusive language.

Valcarcel argues that she was subjected to coercion by the Task Force when she was arrested and questioned. She relies on the following: At the traffic stop she was yelled at by an officer to place both of her hands out of the car window. When she had difficulty unbuckling her seat belt, Officer Gregg yelled at her again asking whether she was stupid. When she was taken inside the DEA headquarters she was placed in an interview room alone. Although she testified at the evidentiary hearing that she was fearful because she did not know how long she would be kept there without anyone knowing where she was, she never expressed this apprehension to the agents. She complains that she had to wait for the arrival of a female officer before the agents would allow her to use the restroom.

Based of the totality of the circumstances I conclude the officers acted reasonably and prompt in response to her request to use the restroom. Valcarcel claims she was cold and uncomfortable in the interview room. There is no evidence that she expressed such concerns at the time of the interview. Ms. Valcarcel testified that when she was initially stopped by the police she believed she was being car-jacked. The evidence indicates that the officers identified themselves as police right after the stop. From the circumstances I conclude that the officers acted reasonably in effecting the stop, providing her with their identity, and displaying their credentials. There is no evidence of any mental or emotional condition which might have prevented Valcarcel from exercising her free will to waive her Miranda rights

and agree to answer questions by the officers. I conclude that her waiver of <u>Miranda</u> rights was not the product of any coercion by government agents.

Valcarcel did not request to talk to an attorney. The invocation of the <u>Miranda</u> right to counsel requires at a minimum some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. <u>Davis v. United States</u>, 512 U.S. 452, 459 (1994). Here, the interrogation took place after a <u>Miranda</u> waiver. Only an unambiguous or unequivocal request for counsel triggers the protections of <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981). <u>Edwards</u> holds that any statement a suspect makes after requesting an attorney and before being provided with one are not admissible unless it is clear that the suspect initiated the dialogue.

The statement "do I need a lawyer" in the context of this case was more in the nature of a request for advice and not an unequivocal request for counsel. See for example, <u>Norman v. Ducharme</u>, 871 F.2d 1483, 1486 (9th Cir. 1989); <u>United States v. Ogbuehi</u>, 18 F.3d 807, 813 (9th Cir. 1994). Thus, even if Valcarcel made such a statement as she claims, it should not be construed as the invocation of her right to counsel.

Search Warrant 3AN10-1168SW for the Cadillac lists the cell in a generic list of items to be seized. The return to that warrant states nothing was

seized. Valcarcel argues that the cell phone, her purse and the garage door opener were removed from her vehicle in violation of the Fourth Amendment.

Seizure of the Cadillac at the scene and its temporary detention were justified for the protection of the vehicle and its contents. An officer drove the vehicle to the DEA building and parked it there as a convenience to Valcarcel pending the decision whether she would be released. There was no impoundment or inventory search conducted. The items removed from the car were in plain view. The cell phone was located in the cup holder of the vehicle. Tr 4-201. The garage door opener was on the visor and her purse was located behind the driver's seat. Tr 4-202. The officers took reasonable steps to secure the vehicle and its contents. See United States v. Prazak, 500 F.2d 1216 (9th Cir. 1974).

Before Valcarcel left the DEA building the officers gave her the keys to the vehicle, the purse, phone and garage door opener, and a copy of the search warrant for her vehicle as well as an inventory sheet of what had been taken out of 1831 Early View. Tr 4-225, 226.

No evidence suggests that the officers looked inside Valcarcel's purse, or that they looked at the screens on the cell phone without her permission. The right of seizure of the cell phone in plain view in the vehicle when the vehicle was moved by the officers does not include the right to view its contents. Removal of the belongings from the vehicle was a reasonable procedure for the protection of

Valcarcel's property and for that of the officers pending application for a search warrant and determination of whether forfeiture or impoundment of the vehicle would be undertaken.  Harris v. United States, 390 U.S. 234 (1968).  No seizure of the content of the text messages on the cell phone occurred until after Valcarcel consented to the officers viewing her text message on the phone.

### Search Warrant for Early View Residence

Search Warrant 3AN-1069 SW was issued to search the premises known as 1831 Early View Drive for evidence pertaining to crimes involving controlled substances based upon the affidavit of Officer Gregg.  The illegal observations of the protective sweep should not have been included in the affidavit for the search warrant for the Early View residence.  United States v. Vasey, 834 F.2d 782, 788 (9th Cir. 1987), citing Wong Sun v. United States, 371 U.S. 471 (1963). "The mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant."  *Id.*  Once the tainted evidence is removed this court must determine whether the remaining untainted evidence would provide a neutral judicial officer with probable cause to issue a warrant.

Viewing the redacted affidavit, the question is whether there was a fair "probability" that contraband or evidence of a crime would be found in the residence. Probable Cause means a fair probability that contraband or evidence of a crime will

be found in a particular place, based on the totality of circumstances. United States v. Diaz, 491 F.3d 1074, 1078 (9th Cir 2007); United States v. Gourde, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc) ("[P]robable cause means 'fair probability,' not certainty or even a preponderance of the evidence.").

The sufficiency of a search warrant is in the first instance determined on the basis of the information before the issuing judge. United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986). On a motion to suppress, the reviewing court should not make a de novo determination of probable cause; the decision to issue the warrant is to be upheld if supported by a substantial basis in the record. Massachusetts v. Upton, 466 U.S. 727, 728, 104 S.Ct. 2085; Illinois v. Gates, 462 U.S. 213, 238-239 (1983).

An issuing judge's determination of probable cause is entitled to great deference. United States v. Arenal, 768 F.2d 263, 266 (8th Cir. 1985); United States v. Ross, 713 F.2d 389, 393 (8th Cir. 1983). Probable cause to issue a search warrant exists when an affidavit sets forth sufficient facts to justify a prudent person in the belief that there is a fair probability that contraband or evidence of a crime will be found in a particular place. Illinois v. Gates, 462 U.S. at 238; Brinegar v United States, supra. Absolute certainty of the presence of such evidence is not required. United States v. Zahursky, 580 F.3d 515, 521 (7th 2009); Carroll v. United States, 267 U.S. 132, 153-56 (1925).

After deleting the reference to the computer screen, the ceramic container and luggage tags showing "California", the affidavit contains sufficient probable cause to support its issuance. The affidavit describes Gregg's training and experience as a police officer. It describes how the package came to the attention of DEA through FedEx security personnel including their observation of what appeared to be two baggies concealed in two objects inside a box as being shipped FedEx. The affidavit describes that prior to the controlled delivery the substance inside the package tested positive for the presence of cocaine.

The affidavit without the tainted evidence also indicates the following: The parcel was delivered by DEA SA Clementson in a controlled delivery subsequent to a contingency warrant. Liza Valcarcel took the package from the Stella Place residence to 1831 Early View Drive. Valcarcel was stopped when driving from the Early View residence. Entry was made into the Early View Drive whereupon its four occupants were secured and the FedEx parcel was found in a upstairs bedroom. Upon securing the residence the following observations were made: The FedEx parcel bearing tracking No. 8714 4934 0866 was recovered from the master bedroom. In the garage another Fed Ex Parcel with the same dimensions as the controlled delivery package was observed. In a downstairs recreation room a computer [suitable for tracking the package] was observed. Sandwich bags, which are frequently utilized as packaging material, were observed

in the master bedroom. A shotgun was observed in the corner of the master bedroom. Marijuana paraphernalia (multiple pipes with residue and burnt marijuana cigarettes) were observed in the downstairs room.

I determine that Officer Gregg's failure to inform the State Magistrate that the monitoring device was no longer able to alert them to when the package was opened was negligence at most and not done wilfully or with the intent to deceive or mislead the court. The absence of that fact is not significant to the validity of the warrant.

The defendants have failed to make "a substantial preliminary showing that a false statement [was made in the warrant affidavit,] knowing and intentionally, or with reckless disregard for the truth." Franks at 155. No separate Franks hearing is warranted.

The defendants dispute whether a copy of the search warrant was left at the residence or provided to one of the residents. Detective Doll testified that she left a copy of the search warrant at 1831 Early View Drive. Tr 4-70. The error, if one occurred, is a mere technical error and suppression is not warranted because neither defendant has suffered any prejudice or has shown that any violation was deliberate.

Alaska Statute 12.35.025 (b) provides: When property is seized under this chapter the peace officer taking the property shall give to the person from whom

or from whose premises the property was taken a copy of the warrant, a copy of the supporting affidavit, and a receipt for the property taken, or shall leave the copies and the record at the place from which the property was taken.

Federal Criminal Rule 41(d) has a similar rule. It provides that the "officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant . . . or shall leave the copy . . . at the place from which the property was taken." In the Ninth Circuit a violation of this rule does not demand suppression of seized evidence unless one of three circumstances are present. These circumstances are: (1) the violation rises to a constitutional magnitude; (2) the defendant was prejudiced, in the sense that the search would not have occurred or would not have been so abrasive if law enforcement had followed the rules; or (3) officers acted in intentional and deliberate disregard of a provision in the rule. United States v. Williamson, 439 F.3d 1125 (9th Cir. 2006). Suppression is rarely the proper remedy for a Rule 41 violation. Id. at 1132.

As Williams instructs the Supreme Court has stated that the Federal Rules of Criminal Procedure do "not constitute a statutory expansion of the exclusionary rule." Id. citing United States v. Calandra, 414 U.S. 338, 348, n.6 (1974). In the instant case neither of the defendants contend that the violation rises to a constitutional magnitude.

Williamson, explains that prejudice means that the search would not have occurred or would not have been so abrasive if the law enforcement officers had followed the rule.  There is no contention that no search would have occurred or that the search would have been "less abrasive" if there was not a Rule 41(d) violation.  Under the circumstances even if Detective Doll did not leave a complete copy of the search warrant at the residence the officers acted in good faith. The defendants have suffered no prejudice in failing to serve a complete copy of the search warrant.  The failure to do so was not of a constitutional magnitude requiring that the exclusionary rule be applied.

**SUMMARY**

The magistrate recommends that the motions to suppress be granted in part  with respect to evidence of the FedEx web site on the computer screen, the black ceramic candle holder behind the computer, and the presence of California tags on luggage.  These "observations" were made beyond the scope of a lawful protective sweep and should be suppressed. To the extend that the government may seek to use the "opening photographs" in their case-in-chief these photographs should be suppressed as preceding the warrant.  In all other respects the motions to suppress should be denied. IT IS SO RECOMMENDED.

//

//

DATED this 3rd day of March, 2011, at Anchorage, Alaska.


 /s/ John D. Roberts
JOHN D. ROBERTS
United States Magistrate Judge


Pursuant to D.Ak.L.M.R. 6(a), a party seeking to object to this proposed finding and recommendation shall file written objections with the Clerk of Court no later than **NOON on March 11, 2011**.  The failure to object to a magistrate judge's findings of fact may be treated as a procedural default and waiver of the right to contest those findings on appeal.  McCall v. Andrus, 628 F.2d 1185, 1187-1189 (9th Cir.), cert. denied, 450 U.S. 996 (1981).  The Ninth Circuit concludes that a district court is not required to consider evidence introduced for the first time in a party's objection to a magistrate judge's recommendation United States v. Howell, 231 F.3d 615 (9th Cir. 2000).  Objections and responses shall not exceed **five (5) pages** in length, and shall not merely reargue positions presented in motion papers.  Rather, objections and responses shall specifically designate the findings or recommendations objected to, the basis of the objection, and the points and authorities in support.  Response(s) to the objections shall be filed on or before **NOON March 17, 2011**.   The parties shall otherwise comply with provisions of D.Ak.L.M.R. 6(a).

Reports and recommendations are not appealable orders.  Any notice of appeal pursuant to Fed.R.App.P. 4(a)(1) should not be filed until entry of the district court's judgment.  See Hilliard v. Kincheloe, 796 F.2d 308 (9th Cir. 1986).